## HOUSTON, E. & W. T. RY. CO. v. HOUGH.* (No. 1052.)

(Court of Civil Appeals of Texas. Beaumont. Feb. 7, 1924. Rehearing Denied March 26, 1924.)

1. Master and servant ⬅285(11)—Whether engineer's failure to stop was negligence proximately causing injury to switchman by collision with automobile held for jury.

In an action for injuries to a switchman, sustained when coal car on which he was riding was struck by automobile at a crossing, evidence *held* to raise issue for jury as to whether the failure of the engineer to stop before crossing the street constituted negligence proximately causing the accident.

2. Master and servant ⬅286(30)—Evidence as to switchman's injury in collision with automobile held to raise issue for jury as to engineer's negligence in failing to stop.

In an action for injuries to a switchman, sustained when coal car on which he was riding was struck by an automobile at crossing, evidence *held* to raise issue for jury as to whether engineer negligently failed to stop on discovery that automobile driver intended to cross tracks.

3. Master and servant ⬅289(1)—Contributory negligence of switchman injured in collision with automobile held for jury.

In action for injuries to switchman, sustained, when coal car on which he was riding was struck by an automobile at crossing, evidence *held* to raise issue for jury as to whether the switchman was contributorily negligent.

4. Master and servant ⬅137(3)—Failure to ring bell and blow whistle held not absolute negligence as to switchman injured in collision.

The failure to ring bell and blow whistle of locomotive on approach to crossing as required by statute was not absolute negligence as to switchman injured in collision between coal car and automobile.

5. Master and servant ⬅286(30)—Whether failure to sound warnings was negligence as to switchman injured in collision held for jury.

In action for injuries to switchman, sustained in collision of coal car and automobile at crossing, the question of whether the trainmen's failure to blow whistle and ring bell constituted negligence as to the switchman *held* for the jury.

6. Negligence ⬅62(1)—Rule as to intervening cause of injury stated.

Original negligence may be superseded by a new intervening cause, but the negligence of the intervening agents to relieve the person originally negligent from liability must be such that its consequence could not have been foreseen by the person guilty of original negligence.

⬅For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes
*Writ of error dismissed for want of jurisdiction May 14, 1924.

**7. Master and servant ⟝139—Railroad liable for injuries to switchman caused by its negligence and concurrent negligence of automobile driver.**

If injury to switchman, sustained in collision between coal car and automobile at crossing, could have been avoided if the engineer had exercised the proper care to avoid the accident, the railroad was liable, even though the negligence of the automobile driver was a proximate cause of the injuries.

**8. Trial ⟝350(5)—Refusal to submit issue as to whether third party's negligence concurring proximate cause of injury to servant held not error.**

In action for injuries to switchman sustained in collision of coal car and automobile at crossing, in which there was evidence sufficient for submission to jury of question of whether the railroad was guilty of negligence proximately causing the injuries, the court's refusal to submit question of whether the automobile driver's negligence was a proximate cause held not error, though such question was raised by the evidence, since negligence of automobile driver was no defense if railroad's negligence was a proximate cause.

**9. Trial ⟝215—Refusal to instruct as to railroad's duty to occupants of automobile in collision with which switchman injured held not error.**

In action for injuries to switchman, sustained in collision of coal car and automobile at crossing, in which special issues submitting question of railroad's liability under discovered peril doctrine were so framed as to limit railroad's duty to the situation in which the switchman had been placed by the facts of the case, the court's refusal to instruct as to duty toward occupants of automobile held not error.

**10. Trial ⟝352(5)—Special issue held not duplicitous but grouping of facts on issue of discovered peril.**

In action for injuries to switchman, sustained in collision of coal car and automobile at crossing, special issue, "Did the engineer see the automobile approaching the crossing and realize that the driver of the automobile would not stop, and did the engineer understand and appreciate the danger of collision between the automobile and the coal car and injury to plaintiff, and realize that plaintiff probably would not extricate himself from his situation in time to have enabled the engineer to avoid the injury by the use of ordinary care?" held not duplicitous, being not a group of issues but an affirmative group of facts on the one issue of discovered peril.

**11. Trial ⟝352(1)—Special issue held not misleading as intimating effect on ultimate rights of parties of answer to another issue.**

In action for injuries to switchman, sustained in collision of automobile with coal car on which he was riding, in which the first special issue was whether the engineer stopped the engine and coal car before crossing the street where the accident occurred, second question stating that "in the event you answer the foregoing question 'No,' and only in that event, then answer the following question," held

not objectionable as against contention that there was an intimation to the jury that an affirmative answer to question No. 1 would have constituted a verdict in defendant's favor.

**12. Trial ⟝352(5)—Special issue held not duplicitous.**

In action for injuries to switchman, sustained when coal car on which he was riding was struck by automobile at crossing, special issue, "Did the plaintiff signal the engineer to stop before crossing or while crossing Ellis avenue in time to enable engineer to avoid the injury by the use of ordinary care?" held not duplicitous.

**13. Trial ⟝350(7)—In action for injuries to switchman, refusal to submit certain special issues bearing on contributory negligence of plaintiff held not error.**

In action for injuries to switchman, sustained when coal car on which he was riding was struck by automobile at crossing, refusal to submit special issues as to whether the switchman realized before he was injured that the driver of the automobile would likely run into the way of the car and injure him, and as to whether the switchman remained on the car after he realized that the engineer would not obey his signals, held not error, since an affirmative finding on such questions would not as a matter of law have constituted negligence proximately causing injury.

**14. Appeal and error ⟝742(5)—Appellant's statement that charge not raised by evidence held insufficient.**

The Court of Civil Appeals cannot review a submission of a certain paragraph of the court's charge on the mere statement of the appellant that "this charge is not raised by the evidence."

**15. Trial ⟝191(10), 194(19)—Charge held not on weight of evidence or to assume facts.**

In a negligence action, the court's charge that, "in this connection, you are charged that the wrongful choice of means of escape in positions of peril, where the mind acts under the excitement of the occasion and in an emergency, is not negligence," held not on the weight of the evidence, nor to assume that the plaintiff was in a perilous position, nor that in remaining upon the car on which he was riding at time of accident he acted under a state of excitement and in a state of emergency.

**16. New trial ⟝140(3)—Evidence held not to show misconduct of juror during deliberations.**

In a negligence action, evidence as to whether a juror during deliberations stated that the defendant was protected by insurance, that such cases should be arbitrated, and that he himself had a case against the defendant which they had refused to settle, held to warrant the refusal of a new trial.

**17. New trial ⟝44(2)—Statements by juror during deliberations held not to require court to grant new trial.**

Statements by a juror in an action against a railroad that railroad was insured, that such cases should be arbitrated, and that he had a case against the railroad which they had refused to settle, held not to require the court to grant the railroad a new trial.

⟝For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**18. New trial ⟨⟩105—Newly discovered evidence only cumulative impeaching testimony does not require new trial.**

Refusal to grant a new trial on the ground of newly discovered evidence was not error, where the evidence in its nature was only cumulative impeaching testimony.

Appeal from District Court, Angelina County; L. D. Guinn, Judge.

Suit by W. H. Hough against the Houston, East & West Texas Railway Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Garrison & Watson, E. A. Berry, and Baker, Botts, Parker & Garwood, all of Houston, for appellant.

J. J. Collins and C. B. Collins, both of Lufkin, for appellee.

WALKER, J. This was a personal injury suit by appellee against appellant, and resulted in a verdict in his favor for the sum of $15,000. The following excerpts from the testimony of the witnesses afford a sufficient statement to review all questions involved.

The engineer, C. Mathews, testified as follows:

"I was in a position at all times, from the depot until Hough was injured, to see all of Hough's movements and actions, and I did see them. The brakes on the engine were in good shape; I kept them that way all the time; I made it a specialty of keeping up the brakes myself. The automobile was about half way between the turn here [indicating] where you turn around the corner Park, and crossing, right front, just about the middle of the block from the fire station, when I first saw it.

"Judging from the movement of the car, it was 35 or 40 feet, nearly the width of the street, this side of the railroad track, when he commenced turning to the left as if to go around the end of the car. He was on the extreme right-hand side of the street, before he commenced turning to the left, as appeared to me, we were turning to get around the end of the car. He followed the right-hand side of the street, and on the right-hand side of the street, until he reached a point opposite where the little cement post is in the street east of the crossing, and then commenced to turn to the left, as though he intended to run around the south end of the coal car, and go on over the crossing. I did not at any time blow the whistle from the time I started my locomotive some two or three hundred yards north of Ellis avenue crossing and until Hough was injured. I saw the automobile coming at a rapid rate of speed just after he turned the corner.

"At that time I was apprehensive that he would run into me. As well as I remember, the injury occurred about 8 o'clock. It was dark and rainy. It had been raining, but it wasn't raining very hard at the time he got hurt. It was our custom to stop and flag the crossing. I don't know about any rule of the company being in force at that time to stop and flag this particular crossing, but the book of rules require you to flag all crossings when you are shoving cars ahead of you. I can't remember exactly whether I was flagged to stop for this crossing or not on this particular occasion.

"As I moved south from the depot towards and over Ellis avenue crossing, I was on the east side of the locomotive. During all of that time I kept a lookout towards Ellis avenue crossing and the street on the east side of it. I was in a position to see and did see all of Hough's movements and signals, during that time.

"From the time I passed the depot going south until the accident, I watched and looked for the movement of automobiles east of Ellis avenue, and I kept my eye on those automobiles as near as possible. The air on the engine was working in good shape. I think it was some 13 or 14 feet that the train moved from the time it struck the automobile until it stopped; we took all measurements that night before we moved anything. I remember Mr. Rentzel, D. Crumpler, old man Crumpler, and the roadmaster's clerk were all there when we took the measurements, but I don't remember now what they were. In fact I was carrying one end of the tape. I wouldn't say whether it was 21 feet or 25 feet or what. When the automobile struck the car it was nearer on the left-hand side of the crossing going west. I couldn't say exactly how far it was to the left of the center of the crossing. We had crossed the center of the crossing with the end of the car. The car was loaded with either sand or gravel or both. The track was practically where the injury occurred. It is about 50 yards from the railroad track to the first turn in the street coming east from the Ellis avenue crossing, but I have never paid any particular attention to the distance across there. I could have seen the automobile approaching the track, looking east, when he made the first turn around the park, I guess I could have seen him 50 yards, if I had been looking across the town. The automobile was just about halfway between the turn here, where you turn around the corner of the park, and crossing, right front, just about middle of block of fire station when I first saw it. The automobile was going at least 25 miles an hour, and continued at practically that same speed until the collision.

"Crumpler swung in on the left side of the crossing, and looked to me like he was trying to run around the end of the car. I don't think he would have turned exactly as he did turn, if he had been trying to avoid striking the train, as there were two other automobiles over on the other side of the crossing, already over there on the left-hand side of the street coming east. Crumpler's car was on the extreme right-hand side of the street before he made his turn to the left, about like they usually drive on the north side of the street there. There was a cement box out in the middle of the street, and he was on the right-hand side of the box, and that is where he began his turn.

"When I am about to go over a crossing in a case where it is an unusually public crossing, such as Ellis avenue is, I myself personally look up and down the street to observe persons who might be about to make the crossing, in addition to observing the signals of my train crew. On this particular occasion, when Hough was injured, and before I started over the

crossing, I looked east on Cotton square from Ellis avenue crossing for persons or cars approaching the crossing and I kept a watchout in this direction as I proceeded over the crossing. Before proceeding across Ellis avenue at the time Hough was injured, the fireman was ringing the bell continuously and had been doing so from the time we started down through the passenger track and up until the time the engine was stopped to flag the crossing, and did not stop ringing the bell at all.

"I don't remember seeing any signals at all by Hough when we stopped to flag the crossing. I don't remember seeing Bill flag me at all, as when I saw the car coming I saw what was going to take place. Bill could have flagged me at the same time, and on account of my watching the automobile I might not have seen it, but I saw the car (the one Crumpler was driving) before anybody else saw it. I saw just exactly what was going to happen before anybody else saw what was going to happen. At least, what I figured was going to happen did happen. I figured that if I did not catch the car on the end of the coal car, that he was bound to hit the car at the rate of speed he was driving (Crumpler), and that somebody was going to get hurt.

"All the time I was seeing this car and realizing what was about to happen, I knew that Hough was hanging on that stirrup; I had my eye on him all the time, on him and the car together.

"It was the custom to have a light on the rear end of the train when you are backing up at night when you are switching."

Ed Anderson testified:

"I am a boiler maker by trade, but I am working here now in a drug store. I have worked some in the railroad business; I fired some and did switching work. I saw the accident in which the plaintiff in this case was injured; I was between the Brookshire Café and the W. O. W. Restaurant at the time the accident occurred.

"I saw an engine on the track before the collision. It was down right in front of the station, backing up towards the foundry or machine shops at about 10 or 12 miles an hour. I saw it when it entered and while it was crossing Ellis avenue. It was going at about the same rate of speed at that time, as it was when I first saw it. From the time I first saw the engine up by the depot, it didn't stop until the collision occurred. I saw a man on the end of the gondola car that the engine was pushing. He was on the end of the car nearest the crossing, on this side of the car (east side of the car). He looked like he was maintaining his hold on that side of the car by having one foot in the stirrup and the other arm hooked in the step, and he had a lantern in his other hand. I couldn't tell which way he was facing very well, but it seemed like he was using his left arm to hang on with.

"The man on the end of the car was flagging, when I first noticed him and when the end of the coal car nearest me reached Ellis avenue and up to the time of the collision he was flagging, and then the accident occurred. I saw him giving signals. When he gave the signals, it looked like the end of the coal car was 30, 35, or 40 feet above the north line of Ellis avenue. He was continuing to give the signals when the coal car entered Ellis avenue. He gave him a washout signal. It is the quickest signal to be taken by the engineer. It means to stop, and the engineer is supposed to heed that quicker than any other signal given. The end of the coal car on which the plaintiff was riding came to a stop after the collision, about on a line with the left-hand side of Ellis avenue (as one goes west), judging from the way the coal car pushed the automobile, the coal car must have moved something like one-half a car's length from the time of the collision until the coal car stopped. I have run a locomotive and have seen them stop in obedience to washout signals."

Leo McCall testified:

"I saw the collision between the automobile driven by Crumpler and the coal car at the Ellis avenue crossing; I was at the side entrance of the W. O. W. Restaurant at the time of the accident. Before the collision I saw the locomotive out there on the railroad tracks coming from the depot. At the time I first noticed it, it was something like 20 or 30 feet from the crossing; that is, the rear end of the coal car was about that distance from the Ellis avenue crossing. I mean the south end of the coal car, the end of it nearest the restaurant was about 20 feet from the street. From that time on up until the time of the collision, the engine continued to move without stopping. It was coming straight ahead towards the restaurant and the crossing. I saw the collision and know that Mr. Hough here got hurt in it. I saw him when I walked out there to where the collision occurred. He was on the side of the car this way facing the restaurant. When I first noticed the coal car there about 20 feet from the Ellis avenue crossing, I saw a man on the south end of it, on the east side, nearest to me. From the time the rear end of that coal car reached the Ellis avenue crossing, coming this way, on up to the time of the collision, that man riding the rear end of the coal car was giving signals, swinging across the track. He was signaling, but I don't know what kind of signals they were; I would call them stop signals. He was flagging his lantern parallel with the track, like he was flagging the engineer. He was swinging across the track.

"The automobile did not turn to the left before it hit the coal car. It drug the automobile sideways when they hit. I know that the automobile was turned to the left about the time they struck, but it was so dark I couldn't tell exactly. I don't know whether he was trying to dodge the train or not."

W. H. Stubblefield testified:

"I saw that collision. I was in my wagon at the side of the W. O. W. Restaurant at the side door of the restaurant. At the time I first noticed the locomotive it was somewhere about the depot coming down this way, towards Houston, the south end towards the W. O. W. Restaurant across Ellis avenue crossing from the depot.

"I was watching that locomotive from the time I first saw it until the collision, because I had a pony that was afraid of the train, and I was holding her. The train never stopped from the time I first saw it up about the depot until they had the collision; that was the first

time it stopped after I saw it; it just kept moving right up to the time of the collision. I was on the east side of the track. When I first noticed that man hanging on the side of the train was when I noticed him begin flagging with his light. I watched him flag along there for 20, 30 or 40 feet. He flagged till he got up pretty close and then he flagged twice this way, and then it seemed like he was trying to crawl into the train, and about that time they went together (meaning the automobile and the coal car). He seemed to be hanging on with one foot in the stirrup and one hand in the handhold and flagging crossways of the track as the train reached Ellis avenue, and he flagged twice the other way just before the collision, and then it seemed like he reached up; the light went up that way; and about this time the collision came. I couldn't say how many times he swung his lantern crossways of the track from the time the rear end of that coal car reached Ellis avenue until the collision, but. it was several times.

"I didn't hear the bell ring or the whistle blow. I could have heard it if it had been blown, but I never heard it.

"I saw the coal car and saw the man's light on it, but it was too dark to see much. I don't remember whether the light on the street was burning or not. I don't think it was; it was awful dark."

Tom J. Bickley testified:

"On the night Mr. Crumpler's automobile, or the one driven by him collided with the coal car on the railroad crossing on Ellis avenue, I was going from Marcus' old place to the Bonner Hotel. I saw the collision. I saw the train coming and the situation there before the collision. When I first saw the train, it was about the depot. At the time I first saw it, it was moving in a southerly direction and did not stop from that time until the collision occurred. There was a man on the rear end of the coal car flagging with a lantern, during the time the train was approaching the crossing where the collision occurred.

"He was hanging on with one hand with his feet in the stirrup. It was awful rainy and dark, and he was flagging just like this, sort of across the track. The man that was flagging as the car came across the crossing at Ellis avenue was the same man that was struck with the automobile. The man that was flagging had his right foot in the stirrup and had his lantern in his left hand, and the other hand was on the handhold. He was flagging the engineer at that time. He was standing on the east side of that coal car on the end nearest to me and flagging his lantern, something like you are flagging now. The coal car was still in motion at that time, and I walked on towards the Bonner Hotel. I didn't see the accident. I met other automobiles on the other side of the track after I crossed over. I think there were three or four of them standing there. I don't know whether they had run up and stopped or not; I never saw them until after the accident. After the accident some automobiles came up, and I turned around and went back."

Vick Massingale testified:

"I was riding in the automobile with Mr. Crumpler and Miss Weeks on the occasion of the collision. As we approached the railroad crossing I saw the cab lights myself. That light was between the crossing on Ellis avenue and the depot at the time I saw it, and the locomotive was moving. From the time I first saw the locomotive moving along there it never stopped until the collision. The automobile was going about 8 miles an hour. No whistle was blown by the locomotive as it approached the crossing, and no bell was rung.

"It was raining, but just a slow rain. We were driving very slow. I guess it was the cab lights that I saw. It was the big light at the top of the end of the engine—the big headlight. I never saw the coal car at all and didn't know it was there until the automobile hit it. I didn't know the engine was shoving a coal car. The first time I knew there was a coal car there was when the automobile hit it, and then I heard the plaintiff holler. We were driving on the right-hand side of the street going down. I don't remember turning and bearing to the left. I guess that maybe the automobile turned and bore to the left, but I don't remember.

"We were on the right-hand side of the street, not very far from the curb at the time we struck the coal car. I can tell that we struck the coal car on the right-hand side of the street without having seen the coal car, because we were driving on the right-hand side of the street."

D. Crumpler testified:

"I went to the scene of this accident on Ellis avenue at the railroad crossing on the night of June 2, 1922, immediately after the same happened, and while the situation remained unchanged, and was there when the measurements were taken to see how far the Ford had been drug, but I didn't take the measurements myself. It had been drug for 22 feet and 1 inch, or 2 inches. When we measured the wheel tracks of the automobile from where it struck the railroad car back to the point where the coal car stopped, the automobile was engaged with the coal car and drug that distance. We determined that distance by seeing the tracks there and the signs on the coal car and the tracks of the automobile back behind the coal car. The automobile tracks extended along the railroad track from where the automobile and the coal car came in contact with each other up as far as the automobile was drug. Those tracks were 18 feet and some few inches long. And we measured a distance from the point where they came together to a place where the coal car stopped to get the 22 feet and 2 inches that the coal car went after the collision. I am familiar with the pictures taken there that night on the ground there. I put that coat there. That is where the track of the automobile began. The automobile tracks ran right up by the coal car along there. Here is a track in the picture right parallel with the railroad track; this picture was introduced in evidence and marked 'Exhibit A' at the back of the statement of facts."

Miss Lottie Weeks testified:

"I was riding in the automobile with Mr. Crumpler on the night that the automobile collided with the coal car on the Ellis avenue crossing here in Lufkin and hurt the plaintiff.

The automobile was going at the rate of about 8 miles per hour. The accident occurred about 8 o'clock at night, I could see the lights of the engine that night. When I first saw it, it was about half way between the depot and Ellis avenue, or near the depot. I didn't see the coal car before the collision. I don't remember hearing the blowing of any whistle and don't know whether the bell was rung or not. I never heard it if it was. The engine did not stop from the time I first saw it until the time of the collision. The automobile was drug down the street by the train from the place of collision. I think it was about 22 feet that the automobile was drug by the coal car after the collision occurred. I don't know how far the coal car ran after the collision occurred.

"On looking forward, I saw a light on the engine that looked to be about half way between Ellis avenue and the depot. The light that I saw was in the cab where the engineer and fireman sit. I never saw the coal car at all, and didn't know it was there until after the collision. The first time I knew there was a coal car crossing the street was when the automobile hit it. When it hit the side of the coal car it turned angling." ·

Rube L. Sessions testified:

"My occupation is that of a conductor, and I have been a conductor for about three years. My occupation prior to that time was that of engineer, and I was an engineer about eight years; also worked as a fireman on a locomotive for about three years. I am familiar with stopping a locomotive, having had occasion to stop them in obedience to emergency signals. I guess I have had to stop locomotives in obedience to emergency signals quite a lot in the ordinary run of my duty.

"I am familiar with the railroad track across Ellis avenue and have operated engines across that street. Assuming that a locomotive engine with the tender and a coal car loaded with sand attached to it, on a rainy night, with the air brake appliances in good order, backing across Ellis avenue at a rate of four miles per hour, the engineer could stop the train immediately if he made an effort to stop it. If he was only going 4 miles an hour and with only one car attached to his engine, he ought to have stopped it as quick as he got the signal, if he had a signal to stop, in 3 or 4 feet. If he wasn't going faster than 3 or 4 miles an hour, he was practically just moving along.

"An engineer ought to apply the air by the time he gets his signal to stop; ordinarily when you flag him he can do it immediately. If an engineer was going ahead he would be sitting like this on (indicating) a seat box with his left hand on his throttle, but backing up he would be hanging out of the window with· his other hand on the throttle so if he was flagged he could stop immediately. The throttle, reverse lever, and air brake levers are all in easy reach of him whichever way he is sitting or going. Taking a rate of 10 miles an hour and assuming all of the other conditions you have named to be the same, with an engine 99,000 pounds on the drivers without any water or oil, I would think that he ought not to go over 10 or 15 feet, that is, with just one car. I am giving these answers based on my experience in stopping· engines."

Without giving in detail the testimony of appellee, it is sufficient to say that the material facts testified to by the above witnesses were also testified to by him as to the failure of the whistle to blow, the bell to ring, the train to stop, and the giving of signals.

The court's charge to the jury, omitting formal parts, is as follows:

"The plaintiff in this case is suing the defendant for damages alleged to have been sustained by him on or about the 2d day of June, A. D. 1923, in the city of Lufkin, where the defendant's track crosses Ellis avenue and while ·in the course of the performance of his duties as switchman for the defendant, alleged to have been occasioned by the negligence of defendant.

"The defendant has answered denying all of the allegations in plaintiff's petition, and by alleging that the plaintiff was guilty of negligence which contributed to the injuries, and by pleading that the plaintiff assumed the risk.

"You are instructed that the plaintiff is bound to establish by a preponderance of legal and competent testimony the facts entitling him to recover with respect to each of the special issues herein submitted, and, unless you believe that the plaintiff has met the burden upon him, you will answer said issues in favor of the defendant. You are the exclusive judges of the weight of the evidence and the credibility of the witnesses, but the law you are bound to receive from the court which is contained herein and be governed thereby.

"This case is submitted to you upon special issues, your answers to which will constitute your verdict.

"By the term 'negligence,' as hereinafter used, is meant, the failure to exercise that degree of care that an ordinarily prudent person would use under the same or similar circumstances.

"By the term 'proximate cause,' as hereinafter used, is meant a cause without which the injury would not have occurred, and from which it could have been reasonably anticipated injury would result as a natural and probable consequence.

"In this connection you are charged that, if you shall believe that the injury to the plaintiff was the direct and proximate result of the negligence of the driver of the automobile and the negligence .of the defendant, in the event you should find the defendant to have been negligent, then you are instructed that the negligence of the driver of the automobile would not excuse the negligence, if any, of the defendant.

"Special issue No. 1: Did the engineer stop the engine and coal car before crossing Ellis avenue? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "No.")

"Special issue No. 2: In the event you answer the foregoing question 'No,' and only in that event, then answer the following question: Was such failure to stop the cars before crossing Ellis avenue negligence? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 3: In the event· you answer special issue No. 1, 'No,' then answer

the following question: Was the failure to stop the cars at Ellis avenue before crossing the direct and proximate cause of plaintiff's injury? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 4: Did the plaintiff signal the engineer to stop before crossing or while crossing Ellis avenue in time to enable the engineer to avoid the injury by the use of ordinary care? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 5: Did the engineer see the signals, if any, in time to enable him to avoid the injury by the use of ordinary care? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "No.")

"Special issue No. 6: If you answer the foregoing special issue No. 5 'No,' and only in that event, answer the following question: Would the engineer by the use of ordinary care have seen the signals to stop in time to have enabled him to avoid the injury by the use of ordinary care? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 7: If you say that the engineer saw or could have seen by the use of ordinary care the signals of the plaintiff in time to have enabled him to avoid the injury, then answer the following question: Was such failure negligence? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 8: If you answer special issue No. 7 'Yes,' and only in that event, you will answer the following question: Was such negligence the proximate cause of plaintiff's injury? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 9: Did the engineer see the automobile approaching the crossing and realize that the driver of the automobile would not stop, and did the engineer understand and appreciate the danger of collision between the automobile and the coal car, and injury to plaintiff, and realize that plaintiff probably would not extricate himself from his situation in time to have enabled the engineer to avoid the injury by the use of ordinary care? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "Yes.")

"Special issue No. 10: If you answer 'Yes' to the foregoing issue then answer the following question: Did the engineer use ordinary care by the use of all the means at his command, consistent with reasonable safety to other members of the train crew to avoid the injury? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "No.")

"Special issue No. 11: Was the injury to the plaintiff caused or contributed to by the failure of plaintiff to use ordinary care for his own safety? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "No.")

"In this connection you are charged that the wrongful choice of means of escape in positions of peril, where the mind acts under the excitement of the occasion and in emergency, is not negligence.

"You are charged that the plaintiff assumed the risk and dangers ordinarily incident to his employment, but he did not assume the risk of the negligence of the engineer, if any, in failing to use ordinary care in the operation of the train, provided such negligence of the engineer, if any, augmented or added to the risk and increased the danger to plaintiff, unless such negligence, if any, and the superadded danger incident thereto, if any, was known to the plaintiff, and by the exercise of ordinary care for his own safety under the circumstances plaintiff could have avoided the injury to himself. Bearing in mind the foregoing, answer the following:

"Special issue No. 12: Was the injury to plaintiff due to one of the risks ordinarily incident to his employment? Answer 'Yes' or 'No' as you find the facts to be."

(Answer: "No.")

"Special issue No. 13: What sum of money would fairly and reasonably compensate the plaintiff for his injuries if paid now? In estimating the damages to plaintiff, if any, you will take into consideration his loss of earnings in the past and the future, if any, and his pain and suffering in the past and future, if any."

(Answer: "Fifteen thousand [$15,000].")

"You are further instructed that, if the plaintiff was guilty of negligence which contributed to the injury, then I instruct you that such contributory negligence is not a bar to plaintiff's right to recover, but you will take into account such damages, if any, that you would have allowed him in the absence of such contributory negligence in proportion to the amount of his contributory negligence, if any.

"Special issue No. 1a: Was the plaintiff, W. H. Hough, at the time he received his injuries, standing on the east side of the coal car near the south end? Answer 'Yes' or 'No.' "

(Answer: "Yes.")

"Special issue No. 2a: Were the injuries to plaintiff W. H. Hough's right leg caused by reason of an automobile driven by Steve Crumpler striking the east side of the coal car crushing plaintiff's leg? Answer 'Yes' or 'No.' "

(Answer: "Yes.")

"Special issue F.: Did Engineer Mathews see and observe the driver of the automobile as he turned same in a south or southwesterly direction? Answer 'Yes' or 'No.' "

(Answer: "Yes.")

"Special issue G: If you answer the above special issues 'Yes,' then you will answer the following special issue: Did it reasonably appear to Engineer Mathews after the driver of the automobile that crushed the plaintiff's leg had turned his automobile in a south or southwesterly direction that said driver of the automobile would attempt to cross in front of said moving engine and car? Answer 'Yes' or 'No.' "

(Answer: "Yes.")

"Special issue H: "If you answer the above special issue G. 'Yes,' then you will answer the following special issue: Did Engineer Mathews, after he saw and realized that the driver of the automobile would attempt to pass, or

cross the track in front of said moving engine and car, exercise ordinary care by the use of all means at his command to stop said engine and car?   Answer 'Yes' or 'No.'"

(Answer:   "No.")

"Special issue J:   Did plaintiff, Hough, before the accident go to or near the center of the street and flag with his lantern for the purpose of stopping automobiles or parties attempting to cross?   Answer 'Yes' or 'No.'"

(Answer:   "No.")

"Special issue K:   Was it the duty of the plaintiff, Hough, to flag or protect said crossing from drivers of automobiles or other persons who might be using or attempting to cross the tracks on Ellis avenue as to the engine and car was approaching and attempting to cross same?   Answer 'Yes' or 'No.'"

(Answer:   "Yes.")

"Special issue No. N:   If you have answered the above question 'Yes,' then answer the following question:   Could the plaintiff, Hough, by the exercise of ordinary care, after he observed the automobile approaching the crossing, and realized that it would likely run into the car and inflict injury upon him, have prevented the injury by jumping from said car before the automobile reached it?"

(Answer:   "No.")

"Special issue No. O:   If you have answered the above question 'Yes,' then was the failure of the plaintiff to leave the said car the proximate cause of. his injury?   Answer 'Yes' or 'No.'"

(Answer:   "X.")

"Special issue No. P:   Did the plaintiff, Hough, before the accident, know and realize that the engineer was not observing his signals and would not stop the car?   You will answer 'Yes' or 'No.'"

(Answer:   "Yes.")

"Special issue No. R:   Was his remaining on the car after the engineer refused to obey his signals negligence?   Answer 'Yes' or 'No.'"

(Answer:   "No.")

"Special issue No. S:   If you have answered the above question 'Yes,' then answer the following:   Was such negligence the proximate cause of plaintiff's injury?   Answer 'Yes' or 'No.'"

(Answer:   "X.")

"Special issue No. U:   Did the plaintiff, Hough, signal the engineer to stop the engine and car so as to prevent the collision between the car and the automobile driven by Steve Crumpler in time for 'the engineer to stop said engine and prevent the collision?   Answer 'Yes' or 'No.'"

(Answer:   "Yes.")

"Special issue No. V:   Did the engineer, Mathews, after he saw and realized or appreciated that Steve Crumpler, the driver of the automobile, would attempt to pass over the track in front of the moving car, exercise ordinary care to stop said engine and car so as to prevent the collision between said car and automobile?   Answer 'Yes' or 'No.'"

(Answer:   "No.")

"Special charge No. 3:   In regard to and explanatory of special issue No. 9, submitted to you by the court, you are instructed that it is the duty of the plaintiff to show by a preponderance of the evidence that Engineer Mathews in charge of said engine realized and knew of the actual perilous position of the plaintiff, Hough, in time to, by the exercise of ordinary care with all the means at his command consistent with the safety of the engine and crew, have stopped said engine in time to have prevented said accident, and you are further charged that it is not sufficient that said engineer in the exercise of ordinary care might have discovered or realized the dangerous and perilous position of the plaintiff, Hough, if he was in a dangerous and perilous position, but that said fact must have been actually known to said Engineer Mathews."

"Special charge No. 5:   In this case you are instructed that the plaintiff cannot recover by reason of the failure of the defendant company to blow the whistle or ring the bell as it approached said crossing, or failure upon the defendant company to have a watchman at said crossing, or to ring the bell or blow the whistle for the purpose of warning its employees of the approach of a train or engine to said crossing.   This duty is only required of a railroad company to persons who might be using or attempting to use said crossing, and then only for the purpose of warning said parties of the approaching of an on-coming train."

"Special charge No. 6:   You must not consider in any manner or allude to in your discussion what effect your answer to any special issue submitted to you will have on the judgment to be rendered by the court in this case."

"Special charge No. 2:   In this case you are instructed that the burden of proof is upon the plaintiff to establish by a preponderance of the evidence the answers to special issues —— to ——, and, if plaintiff has failed to establish by a preponderance of the evidence said issues submitted to you, then you are instructed that it is your duty to answer said special issues against him."

[1-3] Without a further discussion of the facts, it is our conclusion that the statement given by us shows that all issues submitted to the jury were raised by the evidence, and, we overrule all of appellant's assignments that the issues were not raised.   It is our further conclusion that the evidence was sufficient to raise the issue of Crumpler's negligence, and that such negligence was a proximate cause of the injury to appellee.

[4, 5] Appellant complains of the refusal of the court to sustain its special exception to the allegations of negligence in failing to blow the whistle and ring the bell.   These issues, though duly pleaded, were withdrawn by the court from the jury, as shown by the charge.   The contention is made that the admission of evidence on these issues was error because, as a matter of law, negligence could not have been predicated on the failure of appellant to blow the whistle and ring the bell. This contention is made also in relation to the other issues of negligence submitted.   In our judgment, the court did not err in failing to sustain the special exceptions, but correctly received evidence on those issues.   The appellant was under no statutory duty to appel-

lee to ring the bell and blow the whistle, and the failure so to do was not absolute negligence in its relation to appellee, but appellee being in a place of danger, in the discharge of his duties to appellant—that is, the evidence raised that issue—appellant rested under the common-law duty to appellee to exercise ordinary care for his protection. It was for the jury to say whether the failure to ring the bell or blow the whistle or do the other things charged against it was a failure to exercise that degree of care. If negligence, the evidence raised the issue of proximate cause in relation to each issue submitted, as well as the failure to blow the whistle and ring the bell.

[6] Appellant contends in this case that as a matter of law the negligence of Steve Crumpler, the driver of the automobile, in striking appellee, was the sole, direct, proximate cause of appellee's injury, and as a matter of law constituted an intervening cause, superseding and making inoperative the negligence of appellant, and that, though appellant may have been negligent in all of the respects charged, such negligence as a matter of law could not have been a proximate cause of appellee's injury. Charges embodying this legal proposition were requested, and also special issues submitting the negligence of Steve Crumpler, all of which were refused. However, appellant did not request a charge nor a series of questions which would have submitted the negligence of Steve Crumpler as the sole, direct, proximate cause of appellee's injury. Our courts have at all times recognized that the primary or original negligence of one actor in an accident may be superseded by a new intervening cause. Seale v. Railway Co., 65 Tex. 274, 57 Am. Rep. 602. But in all such cases the negligence of the intervening agents must be of that character that its consequences could not have been foreseen by the party guilty of the original negligence. Appellant recognizes that in its proposition, as follows:

"The original wrongful or negligent act will not be regarded as the proximate cause where any new agency not within the contemplation of the wrongdoer has intervened to bring about the injury."

[7, 8] We recognize this as a sound legal proposition, directly applicable to the facts of this case, but in the judgment of this court the testimony of the engineer alone clearly raised the issue that he should have foreseen the injury to appellee. His place of danger, the manner in which he was discharging his duty, were known to the engineer. The public use of Ellis avenue, the character of the night, were known to the engineer. He saw the automobiles on the east side of the railroad, and especially saw the automobile approaching that injured appellee. He said that he foresaw the very accident that happened. If the injury to appellee should have

260 S.W.—16

been foreseen by appellant as a consequence of its negligence, then Steve Crumpler's negligence was an immaterial matter, and the court did not err in so charging, nor did he err in refusing to submit appellant's question carrying the issue to the jury, though raised by the evidence.

We think the facts of this case bring it clearly within the rule announced by the Supreme Court in Railway Co. v. McWhirter, 77 Tex. 356, 14 S. W. 26, 19 Am. St. Rep. 755:

"If an accident occurs from two causes, both due to negligence of different persons, but together the efficient cause, then all the persons whose acts contribute to the accident are liable for an injury resulting, and the negligence of one furnishes no excuse for the negligence of the other."

What we have said disposes of all of appellant's assignments of error on this issue, as well as his criticism of the court's definition of "proximate cause," which was in the usual form. Appellant's requested issues on "proximate cause" presented in different forms the legal proposition advanced by it to defeat this recovery, that is, that the negligence of Steve Crumpler was a new intervening cause, which, as a matter of law, constituted the sole proximate cause of appellee's injury. But all such charges and issues limited the jury in their consideration of the question of liability to whether or not Crumpler was negligent, and whether such negligence was a proximate cause of appellee's injury.

In connection with the court's charge on discovered peril, appellant requested the following special charges, which were refused:

"Charge No. 4 (c) at defendant's request: In this case you are instructed that the plaintiff cannot recover upon the issue of discovered peril submitted to you by the court upon special issue No. 9, upon the ground that the engineer, Mathews, saw and realized that there would probably be a collision between the automobile and the car. The fact that the engineer saw and realized that there would probably be a collision between the automobile and the car or that the occupant of the car would probably be injured by coming in contact with or struck by the said car, but you must find that the engineer actually saw and discovered the perilous position of the plaintiff, Hough, in time for the engineer, by the exercise of ordinary care, with all the means at his command, commensurate with the safety of the engine and car and the employés thereon to have stopped the train so as to prevent the accident."

"Special charge No. 4 requested by defendant: In this case you are instructed that you cannot find for the plaintiff upon special issue No. —— submitted to you by the court, if you should find and believe that the engineer, Mathews, saw and knew, or was informed of the dangerous and perilous position of the occupants in the automobile, but you must find from a preponderance of the evidence that he saw, knew, or realized the actual danger

of the plaintiff, and not the actual danger of the occupants of the automobile approaching said crossing."

[9, 10] The submission of appellant's special charges to the jury could not have aided them in answering questions 9 and 10. Those special issues were so framed as to limit appellant's duty to the situation in which appellee had been placed by the facts of this case. They could not have been misled by the absence of an instruction as to the engineer's duty to the occupants of the automobile, but they were directly instructed by issues 9 and 10 to limit their findings to appellant's duty to appellee. We do not think that issue No. 9 was duplicitous in the sense that would condemn it as being an improper grouping of issues. It was not a grouping of issues, but only an affirmative grouping of facts on the one issue of discovered peril. Had the court submitted this issue in the form suggested by appellant, to wit:

"Was the peril of plaintiff actually discovered by the engineer in time for him, by the exercise of ordinary care, to stop the train, consistent with the safety of his train and crew, in time to have prevented the accident,"

—appellee would then have been entitled to a special charge grouping the facts on the issue of discovered peril as did questions 9 and 10, instructing the jury further as to the effect of their finding on such facts in relation to that question. Fox v. Dallas Hotel Co., 111 Tex. 461, 240 S. W. 517. There was no error in submitting questions 9 and 10. These issues are not open to the objection that they were upon the weight of the evidence, and assume that plaintiff was in a dangerous position, from which he would not extricate himself. Appellant complains of the form of question 10 because it omitted the issue of its engineer's duty to its property, saying:

"As we understand the law, the duty of the engineer, after discovering the peril of plaintiff, is to exercise ordinary care, consistent with the safety of his train and crew," etc.

[11, 12] Abstractly, this is a sound legal proposition, but without application to the facts of this case. There is no suggestion in the evidence, in fact the evidence completely negatives the idea that appellant's property would have been injured had its engineer used all the means at his command to avoid injury to the appellee. The engine and car were moving at a very moderate rate of speed, and it cannot be inferred that either the engine or the car or the track would have been injured, had the engineer applied all the means at his hand to stop the train. If the question of injury to the property was not involved, of course, there was no error in not submitting it. Appellant complains of the introductory clause to question No. 2:

"In the event you answer the foregoing question 'No,' and only in that event, then answer the following question,"

—suggesting that there was an intimation to the jury that an affirmative answer to question No. 1 would have constituted a verdict in appellant's favor. The charge is not open to that criticism. Question No. 1 inquired:

"Did the engineer stop the engine and coal car before crossing Ellis avenue?"

Even without an instruction from the jury not to answer question No. 2 if question No. 1 was answered in the affirmative, the jury would have understood on such an answer to question No. 1, that question No. 2 was not to be answered. We do not think that issue No. 4 is subject to the criticism of submitting two issues in the form of one, thus making it duplicitous.

[13] In connection with its submission of the issue of contributory negligence, appellant requested the following additional issues, which were refused:

"Did the plaintiff, W. H. Hough, before he was injured, see, know, and realize that the driver of the automobile would likely run into the side of the car and inflict injury upon him?"
"Did the plaintiff remain on said car after he realized and knew that the engineer would not obey his signals?"

As presented, no error is shown in the refusal of these charges. An affirmative finding on these questions would not, as a matter of law, have constituted negligence, and, even if negligence, as a matter of law, such negligence would not have been a proximate cause of his injury; as a matter of law, that would have been a fact issue for the jury. Again, appellant complains of the following paragraph of the court's charge:

"In this connection you are charged that the wrongful choice of means of escape in positions of peril, where the mind acts under the excitement of the occasion and in an emergency, is not negligence."

[14, 15] This charge announces a correct rule of law, and error in its submission could only arise under the peculiar facts of this case. The only statement made by appellant is, "This charge is not raised by the evidence." Under such a statement, we cannot review the submission of the charge. It is not on the weight of the evidence, nor does it assume that appellee was in a perilous position, nor that in remaining upon the car "he acted under a state of excitement and in an emergency."

[16, 17] The court did not err in refusing to grant appellant a new trial on the ground "that the jury, in its deliberations, received and considered other evidence than testified to by the witness." One of the jurors testified that during the deliberations some one of their number suggested that the defendant was protected by insurance, that such cases as this should be arbitrated, that he had a case himself against the railway company

which they had refused to settle, etc. But as against the testimony of its own witnesses, appellant makes the following statement:

"The juror Foster Selman testified on behalf of the plaintiff, on defendant's motion for a new trial, that he did not remember anything having been said in the jury room regarding any insurance the railroad company might have; nor did he hear anything with regard to attorney's fees; nor did he hear anything said with reference to a claim that some one of the jurors might have had against a railroad company which had not been paid.

"The juror R. L. Hand testified on behalf of the plaintiff that he did not hear anything said in regard to attorney's fees; nor did he hear any discussion during the jury's deliberations about one of the members of the jury having claims against a railroad company which had not been paid.

"The juror B. S. Quarrels testified that he did not hear anything regarding any insurance the railroad company carried; nor did he hear anything said regarding attorney's fees; nor regarding any claim any member of the jury had against the railroad company."

[18] Under this statement of facts, the court did not err in refusing the new trial, but we believe, even if appellant's evidence had not been controverted, it was not of such a character as to require the court to grant a new trial. Nor did the court err in refusing the new trial on the ground of newly discovered evidence, which was in its nature only cumulative impeaching testimony.

We believe this case was tried without reversible error, and therefore order its affirmance.